# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### April 7, 2004 Session

## STATE OF TENNESSEE v. RONALD FIELDING

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2001-D-2358     Cheryl Blackburn, Judge**

---

**No. M2003-01055-CCA-R3-CD - Filed May 4, 2004**

---

The Defendant, Ronald Fielding, pled guilty to three counts of rape of a child, one count of rape of an incapacitated victim and two counts of aggravated sexual battery. Following a sentencing hearing, the trial court imposed an aggregate sentence of fifty years in prison to be served at 100 percent. On appeal, the Defendant contends that: (1) the trial court improperly weighed the enhancement and mitigating factors; (2) the trial court abused its discretion by ordering that his sentences run consecutively; and (3) his sentence is excessive. Finding no error, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and ALAN E. GLENN, JJ., joined.

David G. Hirshberg, Nashville, Tennessee, for the appellant, Ronald Fielding.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; Helena Walton Yarbrough, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Bernard McEvoy, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case involves the sentencing of the Defendant after he pled guilty to raping and sexually abusing three boys between August 15, 2000, and April 15, 2001. The Davidson County Grand Jury indicted the Defendant on thirty-seven counts of aggravated sexual battery, rape, child rape, statutory rape, furnishing alcohol to a minor, exposing a minor to pornography and rape of an incapacitated victim. On August 9, 2002, the Defendant pled guilty to three counts of rape of a child, one count of rape of an incapacitated victim and two counts of aggravated sexual battery, and the trial court dismissed all the other counts. The parties agreed in the plea agreement to allow the trial court to determine the Defendant's sentences, with a maximum total sentence of fifty years. After a

sentencing hearing, the trial court imposed an aggregate sentence of fifty years to be served at 100 percent. The Defendant now appeals.

The following evidence was presented at the Defendant's sentencing hearing on April 2, 2003. Regina Davenport testified that she was the sister of M.D.,[1] one of the victims in this case. Davenport stated that M.D. knew the Defendant between two or three years before the Defendant was arrested in April of 2001. She explained that she had three brothers, including M.D., and her brothers did not all have the same father. Davenport stated that she and her brothers lived with their mother, who was disabled and unable to work. She testified that, when M.D. was younger, his father was not at home, and their family struggled financially.

Davenport stated that her family met the Defendant through one of her former boyfriends, who was the Defendant's friend. She explained that, after initially meeting M.D. and the rest of her family, the Defendant started coming by their home every day to help M.D. with his homework. She stated that, starting when M.D. was nine years old, M.D. spent every weekend from Friday evening until Sunday evening at the Defendant's home. Davenport testified that the Defendant bought M.D. clothing, shoes, winter coats, jewelry, bicycles and Nintendo games. She said, "[The Defendant] was always taking him to the arcades, always taking him to the movies, always making sure he ate supper, just anything [M.D.] wanted or needed, he got it." Davenport testified that, at first, she and her mother were grateful for the Defendant's help because they thought "he was just trying to be a good person" and help them out. She stated that, because M.D.'s father was not playing a role in his life, she was grateful that there was a man taking an interest in M.D. and being a father-figure. Davenport said that the Defendant's relationship with M.D. lasted approximately two-and-a-half to three years. She explained that the Defendant acted like a father-figure by disciplining M.D. for bad grades. Davenport testified that the Defendant also had friendships with other boys the same age as M.D. at the time he had the relationship with M.D. She stated that the Defendant introduced himself to another parent as M.D.'s father.

M.D. testified that he was thirteen at the time of the hearing and in the eighth grade. He stated that he met the Defendant when he was nine years old and in the fourth grade, and he became friends with the Defendant. M.D. stated that, during the fourth, fifth and sixth grades, he saw the Defendant on most afternoons and spent weekends at the Defendant's home. He explained that, at first, he liked the Defendant and trusted him because he was like a father to him. M.D. stated that the Defendant sometimes told other people that he was M.D.'s father. M.D. testified that there were times when the Defendant touched M.D.'s penis with his hand and masturbated him, and there were times when M.D. touched the Defendant's penis and masturbated him. M.D. further testified that there were times when the Defendant performed oral sex on M.D., and there were times when M.D. performed oral sex on the Defendant. M.D. also stated that there were times that the Defendant had him bend over, and then the Defendant would rub his penis between M.D.'s buttocks. M.D. testified that the Defendant abused him on more than one occasion. He stated that he witnessed the Defendant engage in sexual activity with other boys who were under the age of eighteen. M.D.

_____

[1]It is the policy of this Court to use the initials of child rape victims instead of their full names.

testified that the Defendant provided alcohol to him and other boys, and the Defendant showed them pornography depicting naked men and women. M.D. explained that two out of every four weekends he spent with the Defendant involved engaging in sexual activity with the Defendant. He stated that, when he spent the weekend at the Defendant's home, he would sleep on the couch and in the Defendant's bed. M.D. explained that, when he slept in the Defendant's bed, the Defendant would touch him and abuse him.

Sherry Cook testified that she was the grandmother of J.D., another victim in this case. Cook stated that she has raised J.D. since he was eight years old because his parents were on drugs. She testified that she also cares for J.D.'s younger sister. Cook stated that, during the time that J.D. lived with her, J.D.'s father had not been a part of his life. She explained that J.D. was eleven years old when he met the Defendant, and their relationship lasted about six months before the Defendant was arrested in April of 2001. Cook explained that J.D. met M.D. and J.M., all victims in this case, at the community center in October of 2000, and the Defendant introduced himself as M.D.'s father. Cook stated that the Defendant told J.D. that M.D. "didn't have any friends and [the Defendant] wanted [M.D.] to become friends with [J.D.] and [J.M.]" She testified that she believed that M.D. was the Defendant's son, "that he only got that child on the weekends, and I assumed he was divorced or separated from his wife. . . ."

Cook testified that, after J.D. met the Defendant in October of 2000, J.D. "was happy to meet [the Defendant] and [M.D.] and [J.M.] and he always came home and bragged to me about [how the Defendant] reminded him of his dad. [The Defendant] would take him and play video games and take him to the movies . . ., and [J.D.] was really happy. . . ." She explained that, "all of a sudden, [J.D.] just started changing. He had an attitude problem and then I realized something was going on." Cook said that J.D. visited the Defendant's home almost every weekend. She reported that, since the Defendant's arrest, J.D. has had behavior problems and "gets angry very easily." Cook testified that, before meeting the Defendant, J.D. made very good grades, but, since being abused by the Defendant, he repeated a grade in school and made poor grades.

J.D. testified that he was thirteen years old at the time of the hearing. J.D. stated that he met the Defendant in October of 2000 and became friends with him for about six months until the Defendant's arrest in April of 2001. J.D. said that he enjoyed spending time with the Defendant because he would take him to the mall and to movies. He stated that he went to the Defendant's house almost every weekend for about six months. J.D. testified that, when he spent the night at the Defendant's house, he would usually sleep on the couch or the floor. He explained that other boys would spend the night at the Defendant's house as well, including J.M. and M.D. J.D. stated that he slept in the bed with the Defendant on one occasion, and J.M. slept in the Defendant's bed a couple of times. J.D. testified that the Defendant gave him, J.M. and M.D. alcohol and pornography, and the Defendant smoked marijuana in their presence. J.D. testified that the Defendant touched J.D.'s penis with his hand a couple of times. He reported that the Defendant tried to perform oral sex on him, but J.D. pushed his head away. J.D. stated that he touched the Defendant's penis with his hand a couple of times, but he did not perform oral sex on the Defendant. J.D. testified that the Defendant sexually abused him on one out of every four weekends he spent

with the Defendant. J.D. stated that he saw the Defendant sexually abuse J.M. and M.D.

Rhonda Hannah testified that she was the mother of J.M., another victim in this case. Hannah stated that J.M.'s father was deceased when J.M. met the Defendant in October of 2000. She explained that J.M. met the Defendant and M.D. at the civic center, and the Defendant told her and J.M. that M.D. was his son. Hannah testified that the Defendant told her and J.M. that M.D. was new to the area and did not have any friends, so the Defendant asked if J.M. could spend the night with his son, M.D. Hannah stated that she trusted the Defendant and agreed to allow J.M. to spend the night with M.D. at the Defendant's house. She explained that J.M. went to the Defendant's house every weekend for six months, until the Defendant was arrested in April of 2001. Hannah said that she believed that J.M.'s time with the Defendant was helping J.M. because the Defendant "was taking [J.M.] to the movies and ice skating and swimming and he was just doing so much with [J.M.]" She explained that she thought it was good for J.M. to have another man in his life "because his daddy was gone." Hannah testified that, because of the Defendant's sexual abuse of J.M., her son is angry and backs away from people. She explained that J.M. does not show any emotions and his grades in school have dropped. She stated that J.M. was an honor roll student before the abuse, and now he receives C's and D's.

J.M. testified that he was fifteen and in the ninth grade at the time of the hearing. J.M. stated that he was thirteen years old when he met the Defendant in October of 2000. He testified that, after meeting the Defendant, he began spending most weekends at the Defendant's house until the Defendant was arrested in April of 2001. J.M. explained that, when he would spend the weekend at the Defendant's home, he would sometimes sleep on the couch and sometimes sleep in the Defendant's bed. J.M. stated that, when he, M.D. and J.D slept over at the Defendant's home, one of them would always sleep in the Defendant's bed. J.M. explained that the Defendant would decide who would sleep where. He reported that the Defendant provided alcohol and pornography to him and the other boys, and the Defendant smoked marijuana in their presence. J.M. testified that the Defendant touched J.M.'s penis with his hand, and J.M. touched the Defendant's penis with his hand. J.M. further testified that the Defendant performed oral sex on him on more than one occasion. J.M. stated that the Defendant "tried to put all three of our penises in his mouth" at the Music City Sheraton locker room. J.M. testified that he saw the Defendant sexually abuse M.D. and J.D.

Brandon Carmona testified that, in July of 2000, he and some of his friends saw the Defendant masturbating in an open restroom stall at the wave pool. Carmona stated that he later saw the Defendant at the Old Hickory Community Center with J.D., J.M. and M.D.

Shane Russell testified that he was fourteen at the time of the hearing and was friends with M.D. He stated that he met the Defendant through M.D., and the Defendant introduced himself as M.D.'s uncle. Russell said that the Defendant asked him to go to the movies or to the mall with him and M.D. Russell stated that the Defendant called his school, told them he was Russell's dad and asked to speak to Russell. Russell explained that he spoke with the Defendant and gave the Defendant his home phone number. He stated that the Defendant called him "just about every day"

and "asked if I was masturbating and if I was watching a porno or something." Russell testified that he never went to the Defendant's home and was not sexually abused by the Defendant. He stated that the Defendant stopped calling after his mother told the Defendant that the police were tracing his phone calls.

The Defendant testified that he pled guilty "[i]n the best interest of the victims and in my best interest to avoid a trial and coverage." The Defendant acknowledged reading the psychological sexual evaluation report prepared by a psychologist and agreed with the contents of the report. He agreed that the report stated, "[The Defendant] does not yet appear to fully understand and accept the seriousness and chronocity of his socially unacceptable behavior pattern, addictive behavior, and failure to accept his responsibility as an adult law-abiding citizen." The report also stated, "[The Defendant] is a seriously troubled individual who has not yet demonstrated the capacity to learn from his past mistakes and avoid repeating them. Sanctions in the past do not appear to have been effective as a deterrent." The Defendant explained that, "as far as what the evaluation said, that was at a point where I was being selfish and not really considering the victims in this case, and at this point, I take full responsibility and own up to the things I have done." The Defendant testified that he was sexually abused starting at age nine and ending at age thirteen. He stated that three teen-aged boys sexually assaulted him on several occasions. The Defendant explained that he abused the victims because "I believe it is from past abuse and basically gender confusion, things of that nature, mixed with [the fact that] I did have drug problems that also came in around that same time." He stated that he started using marijuana at around age thirteen and continued using marijuana daily until his arrest in April of 2001. The Defendant testified that he understood what the victims were going through in this case because of his experience of being sexually abused. He explained, "I feel remorse and I feel bad about the things that I've done."

The Defendant testified that he would tell the police and the District Attorney's Office the name of his attackers and give them information about a homicide case he heard from another prisoner. The Defendant stated that he hoped that the trial court, when sentencing him, would consider the fact that he did not physically injure any of the victims and the fact that he recognizes that he has a problem and needs therapy. He explained that he will seek psychiatric help when he is incarcerated. The Defendant stated, "I hope at some point in my older age that I would have a chance to . . . be entered back into the community." He explained that, if he were released later on, "I would hope that I could maybe counsel or talk to other sex offenders who have offended and help them cope with their problems that they are having. . . ." The Defendant asked for the victims' and their families' forgiveness, and stated, "Please have compassion in your hearts and understand that I was abused also as a child."

On cross-examination, the Defendant admitted to being attracted to teen-age boys, but not very young boys. The Defendant acknowledged telling the psychologist that he did not know that sexually abusing the victims was unlawful. The Defendant admitted sexually abusing another boy, J.C., but stated that he did not remember what he did to the boy. The Defendant testified that he did not know why he called Russell repeatedly. He denied providing alcohol to the victims, but admitted providing pornography to them.

After considering the evidence presented at the sentencing hearing, including the pre-sentence report and the psychological sexual evaluation report, the trial court found that the following enhancement factors were applicable to the Defendant's convictions pursuant to Tennessee Code Annotated section 40-35-114 (1997 & Supp. 2002):

> (2) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; . . .
> (8) The offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement [for the convictions of child rape and rape of an incapacitated victim];
> (9) The defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community; . . .[and]
> (16) The defendant abused a position of public or private trust, or used a special skill in a manner that significantly facilitated the commission or the fulfillment of the offense. . . .

The trial court found that the Defendant's assertion that he was abused as a child was a mitigating factor, but the trial court stated, "I'm not going to give it any weight. . . ." The trial court gave "significant weight" to the enhancement factors that the Defendant abused a position of public or private trust and that he has a previous history of criminal convictions or criminal behavior.

The trial court then sentenced the Defendant to twenty-five years for each conviction for rape of a child, Counts 13, 18 and 19, and twelve years for each conviction of aggravated sexual battery and rape of an incapacitated victim, Counts 9, 15 and 30. The trial court found that the maximum sentence on each conviction was "justly deserved" because of the enhancement factors, especially because of the Defendant's abuse of the private trust of the victims. The trial court then determined that consecutive sentencing was appropriate under Tennessee Code Annotated section 40-35-115(b)(5) (1997 & Supp. 2002) because it found that:

> [The Defendant] has been convicted of two or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims; the time span of defendant's undetected sexual activity, which is two to three years in this case; the nature and scope of the sexual acts, which are extensive; and the extent of the residual, physical and mental damage to the victims in this case.

Accordingly, the trial court ordered Counts 18, 19, 9, 15 and 30 to run concurrent with each other, but consecutive to Count 13, for a total effective sentence of fifty years to be served at 100 percent. The trial court found that a fifty-year term "reasonably relates to the severity of the offenses, and that it is necessary in order to protect the public from further serious criminal conduct by the [D]efendant. . . . [The Defendant] is . . . a sexual predator, and as a result of that, he needs to be removed from society . . . ." The Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that: (1) the trial court improperly weighed the enhancement and mitigating factors; (2) the trial court abused its discretion by ordering that his sentences run consecutively; and (3) his sentence is excessive.

When a defendant challenges the length and manner of service of a sentence, it is the duty of this court to conduct a de novo review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ross, 49 S.W.3d 833, 847 (Tenn. 2001); State v. Pettus, 986 S.W.2d 540, 543 (Tenn. 1999); State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Dean, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994). In conducting a de novo review of a sentence, we must consider: (a) any evidence received at the trial and/or sentencing hearing; (b) the presentence report; (c) the principles of sentencing; (d) the arguments of counsel relative to sentencing alternatives; (e) the nature and characteristics of the offense; (f) any mitigating or enhancement factors; (g) any statements made by the defendant on his or her own behalf; and (h) the defendant's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. § 40-35-210 (2003); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging a sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.

Tennessee Code Annotated section 40-35-103(1) (1997) states that:

Sentences involving confinement should be based on the following considerations: (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct; (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant; . . . .

Additionally, "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed. . . ." Tenn. Code Ann. § 40-35-103(5). The trial court may consider mitigating factors and enhancement factors when determining a defendant's sentence. Tenn. Code Ann. §§ 40-35-113, -114. A trial court may order sentences to run consecutively if a defendant is charged with more than one criminal offense and it finds, by a preponderance of the evidence, that one or more of several criteria are met as set forth in Tennessee Code Annotated section 40-35-115. State v. Kern, 909

S.W.2d 5, 8 (Tenn. Crim. App. 1993). Whether sentences are to be served consecutively or concurrently is a matter within the sound discretion of the trial court. State v. James, 688 S.W.2d 463, 465 (Tenn. Crim. App. 1984).

## A. Mitigating Factors

The Defendant does not challenge any of the enhancement factors the trial court applied, rather he argues that the trial erred by failing to apply any mitigating factors. The Defendant argues that the trial court abused its discretion by failing to give adequate weight to the Defendant's assertions that he was sexually abused as a boy. The Defendant also argues that the trial court abused its discretion by not considering as mitigating factors the fact that the Defendant offered to name the men who allegedly abused him as a boy and the fact that he offered to give the police information on a murder suspect. The Defendant further argues that the trial court abused its discretion by failing to apply the mitigating factor that the victims suffered no physical injury.

The State contends that, although a mitigating factor may be applicable, it is within the sound discretion of the trial court to determine its weight. The State contends that the trial court did not abuse its discretion in determining that the Defendant's alleged prior sexual abuse was not entitled to any weight because there was no proof, other than the Defendant's own testimony, of the alleged abuse or that the Defendant was mentally affected by the abuse. Further, the State contends that the trial court did not abuse its discretion in refusing to mitigate the Defendant's sentence based on the Defendant's offers to give police information about the identities of his abusers and information regarding an alleged murder suspect. The State argues that the statute of limitations had run with respect to the Defendant's alleged abusers, and the Defendant did not give the trial court any information about the alleged murder suspect. Finally, the State argues that, while the trial court could have mitigated the Defendant's sentence because there was no evidence of serious bodily injury to the victims, the trial court did not abuse its discretion in refusing to afford that mitigating factor any weight, considering the substantial weight given to the applicable enhancement factors. We agree with the State's assertions.

"Provided the trial court complies with the purposes and principles of the Criminal Sentencing Reform Act of 1989 and its findings are adequately supported by the record, the weight afforded to enhancement and mitigating factors is left to the trial court's discretion." State v. Souder, 105 S.W.3d 602, 606 (Tenn. Crim. App. 2002) (citing State v. Alder, 71 S.W.3d 299, 306 (Tenn. Crim. App. 2001); State v. Kelley, 34 S.W.3d 471, 479 (Tenn. Crim. App. 2000)). In this case, the trial court applied four enhancement factors and gave no weight to any mitigating factors. After thoroughly reviewing the record in this case, we conclude that the trial court did not abuse its discretion by applying the four enhancement factors and in refusing to give any weight to the mitigating factors asserted by the Defendant.

First, the Defendant argues that the trial court abused its discretion by refusing to give any weight to the fact that the Defendant was allegedly abused as a boy. The only proof of this alleged abuse was the Defendant's own testimony, and the Defendant offered no proof to show that he

suffered "from a mental or physical condition that significantly reduced the [D]efendant's culpability for the offense[s]" as a result of the alleged abuse. Tenn. Code Ann. § 40-35-113(8). The Defendant argues that his alleged abuse qualifies as a mitigating factor under Tennessee Code Annotated section 40-35-113(3); however, the Defendant's alleged abuse, under the circumstances of this case, does not tend "to excuse or justify the [D]efendant's criminal conduct. . . ." Therefore, we conclude that the trial court did not abuse its discretion in refusing to give any weight to the Defendant's alleged prior sexual abuse.

Next, the Defendant argues that the trial court abused its discretion by not considering as mitigating factors the fact that the Defendant offered to name the men who allegedly abused him as a boy and the fact that he offered to give the police information on a murder suspect. The record shows that the Defendant's alleged sexual abuse occurred approximately twenty years before the sentencing hearing, so the statute of limitations had run on the Defendant's alleged abusers. Additionally, the Defendant did not give any information to the trial court regarding the information he had on an alleged murder suspect. As of the hearing, the Defendant had not yet disclosed any information to the police or the District Attorney's Office, so the trial court could not determine the significance or usefulness of the Defendant's assistance or the truthfulness, completeness and reliability of the assistance. See State v. Chris Haire, No. E2000-01636-CCA-R3-CD, 2002 WL 83604, at *21 (Tenn. Crim. App., at Knoxville, Jan. 22, 2002) *perm. app. denied* (Tenn. June 24, 2002). Moreover, as the trial court found, the assistance offered by the Defendant did not concern any crime at issue in this case; therefore, the mitigating factor set forth in Tennessee Code Annotated section 40-35-113(10) would not apply because the Defendant did not assist the authorities "in locating or recovering any property or person involved in the crime." Accordingly, we conclude that the trial court did not abuse its discretion by refusing to consider as mitigating factors the fact that the Defendant offered to name the men who allegedly abused him as a boy and the fact that he offered to give the police information about a murder suspect.

Finally, the Defendant argues that the trial court abused its discretion by failing to apply the mitigating factor that the Defendant's conduct neither caused nor threatened serious bodily injury. The trial court stated, "Looking at any mitigating factors, not only the ones that the [D]efendant has pointed out, but all of them, I do not find that his conduct caused nor threatened serious bodily injury. These are rape cases. These are aggravated sexual battery [cases]. That factor is clearly not sustained." While it appears that the trial court found that the Defendant's conduct neither caused nor threatened serious bodily injury, the trial court afforded this mitigating factor no weight, apparently because the Defendant's crimes involved rape and aggravated sexual battery. The record shows that, while the three victims did not suffer serious bodily injury, the Defendant's actions in raping and molesting the victims have caused the victims severe emotional pain and behavioral problems. Moreover, the trial court gave substantial weight to the four enhancement factors, which outweighed any mitigating factors. Therefore, we conclude that the trial court did not abuse its discretion in refusing to apply the mitigating factor that the Defendant's conduct neither caused nor threatened serious bodily injury.

## B. Consecutive Sentencing

The Defendant next contends that the trial court abused its discretion by ordering consecutive sentences in this case. The trial court found that consecutive sentencing was appropriate in this case because:

> [The Defendant] has been convicted of two or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims; the time span of defendant's undetected sexual activity, which is two to three years in this case; the nature and scope of the sexual acts, which are extensive; and the extent of the residual, physical and mental damage to the victims in this case.

We agree with the trial court that Tennessee Code Annotated section 40-35-115(5) applies in this case. The Defendant was convicted of three counts of rape of child, one count of rape of an incapacitated victim and two counts of aggravated sexual battery. The aggravating circumstances are great because the Defendant acted as a father-figure for the victims and abused the victims' trust by raping and sexually molesting them. Moreover, as the trial court found, the time span of the Defendant's undetected sexual activity was two to three years with M.D. and approximately six months with J.D. and J.M. The nature and scope of the sexual acts were serious and extensive because they involved raping by oral sex and sexual molestation. Finally, the record showed that the victims have suffered extreme emotional pain from the sexual abuse, and the abuse has caused the victims to have behavioral problems. After thoroughly reviewing the evidence presented at the sentencing hearing, we conclude that the trial court did not abuse its discretion by ordering consecutive sentencing in this case.

## C. Defendant's Sentence Is Not Excessive

When sentencing the Defendant, the trial court gave great weight to four enhancement factors, especially the fact that the Defendant abused a position of private trust and had an extensive criminal history, including prior convictions for rape and attempted rape of a minor boy. The trial court found that the maximum sentence on each conviction was "justly deserved" because of the enhancement factors, including the Defendant's abuse of the private trust of the victims. The trial court found that a fifty-year term "reasonably relates to the severity of the offenses, and that it is necessary in order to protect the public from further serious criminal conduct by the [D]efendant. . . . [The Defendant] is . . . a sexual predator, and as a result of that, he needs to be removed from society . . . ."

The record establishes that the Defendant targeted young boys living in disadvantaged homes and befriended them, gaining their trust and the trust of their families. After gaining the boys' trust, the Defendant raped and sexually molested them. The Defendant used his relationship with M.D. to target J.D. and J.M., and the Defendant proceeded to rape and abuse those victims. The Defendant attempted to establish a relationship with another boy by calling the boy at school and then

repeatedly calling the boy at home. Moreover, the Defendant received probation from prior convictions for similar conduct, and he violated that probation. The pre-sentence report and the psychological sexual evaluation report indicate that the Defendant lacks potential for rehabilitation, despite the Defendant's statements of remorse and promises that he will seek counseling in prison. Accordingly, we conclude that the trial court properly determined that the Defendant should receive the maximum sentence on each count for a total sentence of fifty years to be served at 100 percent.

## III. Conclusion

In accordance with the foregoing authorities and reasoning, we AFFIRM the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE